UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LAMONT M. ANDERSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:08CV952 CAS/AGF |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

# REPORT AND RECOMMENDATION
# OF UNITED STATES MAGISTRATE JUDGE

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security, following a continuing disability review ("CDR"), holding that due to medical improvement, Plaintiff Lamont Anderson was no longer entitled to previously-granted disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income under Title XVI of the Act, id. §§ 1381-1383f. The action was referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b) for recommended disposition. For the reasons set forth below, the Court recommends that the decision of the Commissioner be reversed and that the case be remanded for further development of the record.

On September 14, 2000, an administrative law judge ("ALJ") found that Plaintiff, who was born on June 30, 1976, and who had no past relevant work, could only perform

sedentary work[1] and was disabled since June 4, 1995 (at which point Plaintiff was 19 years old), due to a seizure disorder, headaches, decreased vision, and back, leg, and shoulder pain -- all due to gunshot wounds sustained in 1994 and 1997; borderline to low average intellectual functioning; and depression and anxiety with a Global Assessment of Functioning ("GAF") score of 55.[2]  (Tr. 408-19.)

On November 4, 2004, Plaintiff was informed that based upon a review of medical records from 2004, it was determined that he had "significant improvement" regarding his back impairment and was no longer disabled, such that his benefits would cease after the January 2005 payment.  Id. 446-49.  After his request for reconsideration was denied, Plaintiff asked for a hearing and one was held on April 4, 2006, before a different ALJ.  Plaintiff and a vocational expert ("VE") testified at the hearing.  By decision dated November 15, 2006, the second ALJ found that Plaintiff had experienced medical improvement in several of his conditions and that as of November 1, 2004, he had the residual functional capacity ("RFC") to perform a wide range of at least light work and

---

[1]   Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; and sitting for about six hours and standing for up to about two hours in an eight-hour workday.  20 C.F.R. § 404.1567(a)

[2]   A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations.  Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32.  GAF scores of 31-40 indicate "[s]ome impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.

certain jobs in that category of work that were identified by the VE. Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on May 2, 2008. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision of November 15, 2006, stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision was not supported by substantial evidence. Specifically, Plaintiff argues that (1) the record does not support a finding of medical improvement of his seizure condition, visual problems, and cognitive and psychological problems; (2) the ALJ's RFC assessment is not supported by medical evidence, especially as regards the ALJ's finding that Plaintiff's seizure disorder was controlled by medication; (3) the ALJ improperly disregarded the opinion of an examining psychologist (Lloyd Moore, Ph.D.) that Plaintiff would have difficulty in a competitive employment situation; and (4) the VE's testimony upon which the ALJ relied was based upon a flawed hypothetical question that did not capture the consequences of Plaintiff's impairments. Plaintiff requests that the ALJ's decision be reversed.

## **BACKGROUND**

### **Medical Record**

The record indicates that Plaintiff has a verbal IQ of 84, performance IQ of 76, and full-scale IQ of 84, indicating borderline to low average intelligence.[3] He quit school in ninth grade after he sustained multiple gunshot wounds -- to his head, left leg, and

---

[3] IQ scores of 70-79 are in the borderline intelligence range, and scores of 80-89 are in the low average range.

3

abdomen -- in June 1994. Following surgery, fragments of a bullet in the left temporal region of the brain were left in place, and Plaintiff was discharged from the hospital on Dilantin, 200 mg/day, due to the risk of seizures. His dosage of Dilantin was increased as his seizure frequency increased and by October 1995 he was taking 500 mg/day. In August 1997, Plaintiff was hospitalized for another gunshot wound, this one to the left buttock. He was discharged after five days. In addition, a knife cut to his right hand injured the third finger to that hand. He also fell and broke his left leg in 1999.[4]

At a regular check-up on August 12, 2003, Plaintiff stated that he had no complaints. He denied suffering any seizures since his last visit (undated) and also denied headaches. The examining source indicated that Plaintiff's seizure disorder was "controlled." Id. 561. When Plaintiff was seen on March 14, 2004, after being a passenger in a car accident the previous day, he was diagnosed with cervical musculoskeletal strain; his seizure disorder was described as " stable." Id. 576. Clinic notes dated June 24, 2004, include the notation "restart Dilantin." Id. 580.

In a CDR report dated April 10, 2004, Plaintiff stated that since his award of benefits, he had "sliced" the tendons of his right hand resulting in limited use of that hand and an inability to lift more than five or ten pounds. He had also fallen and broken his left ankle,[5] and had been in a car accident (in March 2004), injuring his back and neck.

---

[4] The above summary is based largely upon the first ALJ's decision dated September 14, 2000. (Tr. 408-19.)

[5] There is no independent evidence in the record of Plaintiff having broken an ankle in a fall.

4

He wrote that he could not go out in the sun because of his seizure disorder, and that his peripheral vision was "all messed up." Id. 510-16. The SSA interviewer observed that Plaintiff could not move the middle, index, and small fingers of the right hand, had difficulty responding to questions and providing information, and could not remember dates of visits to doctors, hospitals, or clinics. Id. 517.

On a Third-Party Function Report dated July 13, 2004, Plaintiff's (girl)friend of eight years, Shaunta Rogers, reported that Plaintiff could only lift five to ten pounds, had bad vision, could follow instructions (but sometimes needed help), and had seizures when stressed. Id. 519-27.

On October 5, 2004, a state consultant, Saul Silvermintz, M.D., examined Plaintiff in connection with the CDR. Plaintiff's gait was normal and he could walk on his toes and the heel of his right foot, but had difficulty in doing this on his left foot because of an old injury. Dr. Silvermintz wrote that Plaintiff "tended to exaggerate all of his symptoms with posturing." Plaintiff moved around the room well and had no trouble with fine finger movement in spite of alleged trouble with his fingers. Straight leg raising, seated and supine, was intact. Range of motion testing demonstrated a 50% reduction in normal range of motion of flexion and abduction of the right shoulder. Rotation of the cervical spine showed 50% decrease. There was some decrease in the lateral flexion of the cervical spine as well as flexion and extension. Dr. Silvermintz's clinical impressions were seizures, type undetermined, secondary to a gunshot wound to the head; neck and right shoulder pain secondary to traumatic falls or accidents; and probable visual field

5

loss, secondary to the gunshot wound, with a recommendation that this condition should be rechecked with an ophthalmologist. Id. 587-94.

An October 5, 2004 x-ray of Plaintiff's right shoulder showed "normal relationship of the bony structures" with "some irregularity in contour" of the distal right clavicle, "probably due to old trauma." Id. 591. Treatment notes dated October 13, 2004, which are partially illegible, note a three-month history of headaches and general fatigue. Id. 581.

On November 1, 2004, non-examining state consultant John Raabe, M.D., completed a Physical RFC Assessment indicating in checkbox format that Plaintiff could lift 20 pounds occasionally and ten pounds frequently, stand and/or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. He could climb ladders, ropes, or scaffolds only occasionally and was limited in his ability to reach overhead (due to decreased range of motion of the right shoulder, secondary to an old trauma), but he had no other postural limitations, such as balancing and stooping, or manipulative limitations, such as fine fingering. Dr. Raabe indicated that Plaintiff had limited far acuity and limited field of vision, but unlimited near acuity and depth perception. Plaintiff had to avoid even moderate exposure to hazards ("machinery, heights, etc."). Id. 596-600.

The record includes a report dated November 14, 2004, completed by Plaintiff and Ms. Rogers in connection with his appeal of the determination that his disability had ended. Plaintiff reported that he sustained a head injury on July 17, 2004, and that since

6

then his seizures and headaches had gotten worse. He also wrote that he had surgery on his right pinky in July 2004, with screws inserted. Ms. Rogers wrote that Plaintiff "was like an old man not able to do much such as lifting." She wrote that he had vision problems, could not use his right hand, had trouble with his right shoulder, and complained of increased headaches since his head injury. She also wrote that she witnessed his legs "giving out." Id. 538-44.

Plaintiff was seen by eye physician and surgeon Laila Gabrawy, M.D., on December 21, 2004, at which time it was noted Plaintiff had immature cataracts in both eyes and a right optic tract lesion due to a gunshot wound. Plaintiff's best corrected vision was 20/50 in his right eye and 20/70+2 in the left eye. His prognosis was "stable," and glasses were recommended. Physical findings included limping with the left leg, seizures, and an inability "to see from the left side of his visual field." Dr. Gabrawy opined that Plaintiff could perform all work-related activities, such as sitting, standing, walking, and carrying. Id. 603-08.

An advisory medical opinion from W. Bruce Donnelly, M.D., dated January 6, 2005, reported that Plaintiff's right eye had a visual field efficiency of 30%, visual acuity of 20/50, and visual efficiency of 22.5% and 25.8%; and that Plaintiff's left eye had a visual field efficiency of 41%, visual acuity of 20/70, and visual efficiency of 22.5%. Dr. Donnelly wrote that Plaintiff's visual restrictions would be for far vision and visual fields, and opined that Plaintiff's condition did not meet the requirements for a deemed-disabling visual impairment listed in the Commissioner's regulations. Id. 608.

7

On February 14, 2005, Plaintiff was examined and evaluated by a state-agency consulting psychologist, Lloyd Irwin Moore, Ph.D. Dr. Moore found Plaintiff to be cooperative and a fair informant. Plaintiff could not remember his work history, other than that he worked part-time in a fast food restaurant when he was 15 or 16 years old. He reported that he had not been able to work since his multiple gunshot wounds. Plaintiff also told Dr. Moore that he had had no treatment for mental health problems.

Dr. Moore observed that when Plaintiff walked from the waiting room to the examining office, he walked "rather gingerly" and stated that often he did have pain in his lower extremities. Dr. Moore also observed that Plaintiff's affect was appropriate and "he presented himself to be normothymic [a term used for bipolar patients; a state devoid of severe symptoms], however, he reports himself to be euthymic [normal, non-depressed mood]." Plaintiff's thought processes were found to be "intact" and his judgment to be good "at this time." He was able to do simple math addition and subtraction, but had difficulty with multiplication and division.

Dr. Moore diagnosed personality disorder not otherwise specified, borderline IQ, a history of seizure disorder, peripheral vision loss, pain disorder, and a GAF of 55. Dr. Moore indicated that Plaintiff had difficulty walking any distance, due to pain in the feet and lower extremities, and difficulty bending or standing for any length of time, and lifting. Plaintiff's concentration, persistence, and pace appeared to be "somewhat limited" as a result of previous head trauma, and Plaintiff stated that he had difficulty staying on task because of pain. Dr. Moore opined, "All in all, [Plaintiff] is coping well

with his environment at home. Observation and history indicate that he would have difficulty in a competitive employment situation given his cognitive limitations and also complaints of pain." Id. 609-13.

A February 24, 2005 CT scan of Plaintiff's head showed multiple bullet fragments in the left temporal lobe and left occipital lobe, with left encephalomalacia (softening of the brain), including along the bullet track. Id. 633.

Non-examining consulting psychologist, Robert Cottone, Ph.D., completed a Mental RFC Assessment form on March 4, 2005, indicating in checkbox format that Plaintiff had mild limitations in several mental activities, such as the ability to carry out very short and simple instructions; marked limitations in the ability to understand, remember, and carry out detailed instructions; and moderate limitations in the ability to maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. Id. 614-615.

Dr. Cottone wrote that Plaintiff's education, work history, and level of functioning were consistent with simple work. More specifically, he wrote that Plaintiff would be capable of understanding, remembering, carrying out, and persisting at simple tasks; making simple work-related judgments; relating adequately to coworkers or supervisors;

9

and adjusting adequately to ordinary changes in routine work settings. Plaintiff was to avoid work involving intense or extensive interpersonal interactions, close proximity to coworkers, and public contact handling complaints. In an accompanying Psychiatric Review Technique form, Dr. Cottone indicated that Plaintiff had mild functional limitations in activities of daily living; and moderate limitations in maintaining social functioning and maintaining concentration, persistence, and pace. Id. 614-31.

On July 12, 2005, Plaintiff completed a form in connection with his appeal from the determination that his disability had ended. He reported that since approximately December 2004, he had been having more seizures than usual and that they caused injuries, such as biting his tongue. He also reported continued pain in his shoulder and back, and problems with forgetfulness. An unidentified third party (possibly Ms. Rogers), wrote on the form that Plaintiff had had more seizures in the past few months, but that he would not go to the emergency room for them because he would have to wait for hours to be seen. This person also noted that Plaintiff needed to be reminded to take his medications. Id. 545-51.

On August 4, 2005, Plaintiff presented to the emergency room, stating that he had had a seizure during the night while asleep. He had abrasions on his head and reported a head trauma that had occurred two weeks prior. He reported that he took his Dilantin 90% of the time. Testing revealed that his Dilantin (phenytoin) level was subtherapeutic. Id. 667-676A. On September 12, 2005, Plaintiff was seen at a neurology clinic. His medications were listed as Dilantin 500 mg/day, Oxycontin, and Naproxyn. He reported

that his seizures had been "fairly well controlled" on 300 mg Dilantin a day until July 2004, when he sustained a blunt trauma to the back of his head and since which time he had been having one to four seizures a month. He reported that he had the seizures at night and that no one ever witnessed them. He acknowledged that he did not take the Dilantin one to three times a week, but was unsure if the seizures occurred more frequently when he missed his medications. The assessment was seizures that were uncontrolled by 500 mg Dilantin a day. The examining physician wrote that it was not clear whether seizure episodes were related to poor medical compliance. Plaintiff was continued on Dilantin 500 mg a day, instructed on the importance of compliance, and scheduled for follow-up in two months. Id. 697-703.

On November 8, 2005, Plaintiff went to the emergency room due to a seizure, but left the hospital before being seen by a physician. Id. 695. Clinic progress notes from February 13, 2006, stated that Plaintiff was having seizures four to five times a month and migraines. Plaintiff described the seizures as causing shaking of his whole body, tongue biting, and urinary incontinence. Topomax (migraine prevention medication) was prescribed. Id. 710-11.

A right-hand x-ray dated March 3, 2006, showed a well-healed 5th metacarpal fracture following open reduction internal fixation with a dorsal plate and screws. Id. 637.

**Evidentiary Hearing of April 4, 2006 (Tr. 38-94)**

Plaintiff testified to the following: He was having seizures about four times a

11

month in the summer and when he was under stress, and somewhat less often in the winter. He had headaches every day, but only had "thumping" headaches incident to a seizure. He had been taking Dilantin to control his seizures ever since he was shot, with the dosage continually increased. More recently, Topomax was added to help control the seizures. These medications affected his equilibrium so that at the time of the hearing, he could not walk in a straight line. In addition, he had scars on his head due to bumping it during seizures, and that the seizures were getting worse, not better.

Plaintiff could barely turn his neck due to pain, for which he was taking Tylenol (2000 mg/day) and Piroxicam. He also had back pain which was exacerbated by lifting and bending. He had a limited visual field and wore sunglasses, even indoors, as he was doing at the hearing, because light hurt his eyes. His right shoulder was "messed up" from having fallen on it during one of the shooting incidents. He could not reach above his head on the right side. He had trouble reading due to his visual problems, and he did not drive.

Plaintiff also had leg pain since he broke his ankles, and his knees would "give out" if he walked for more than 30 minutes. He could stand and/or sit for only about five minutes before experiencing pain, and he would constantly shift positions. Plaintiff went to church every Sunday but had trouble sitting for too long. He needed help from family members to get dressed and he did no household chores. He had trouble sleeping due to the Topomax. He would go to bed at approximately midnight or 1:00 a.m. every night and wake up at approximately 4:00 or 5:00 a.m. Plaintiff lived with his mother in an

apartment, and his sister and her 13-year old son lived in the apartment upstairs. During the day, he would watch TV, but basically, he did "nothing." During a seizure, Plaintiff would lose control of his bladder and bowels. He saw his girlfriend mostly on the weekends - he did not engage in sex.

Since his last hearing, on April 28, 1998, his physical condition had gotten worse - he had been in multiple car accidents and had broken three bones in his left leg. He currently went to see a doctor every month, alternating between a neurologist and an internist; the internist told him not to drive or work.

The ALJ questioned Plaintiff about his earnings records which showed earnings of about $8,000 per year in 1999 and 2000. Plaintiff thought this was from work he did as a driver of a fork truck, work he left because of his vision problems ("I tore up a couple of things.")

The ALJ then asked the VE to consider whether there were jobs that could be performed by an individual with Plaintiff's vocational factors (29 years old, ninth grade education, and no work experience) and the following abilities and limitations: he had the physical abilities described by Dr. Raabe (able to lift ten pounds frequently, 20 pounds occasionally, push and pull within those weight limits, and stand/walk/sit for about six hours in an eight-hour day); he had a limitation in reaching overhead and could climb ladders, ropes, and scaffolds only occasionally; he had unlimited near visual acuity and depth perception, but limited far acuity and field vision; he had to avoid even moderate exposure to hazardous machinery, heights, and vibration (due to his seizure disorder); he

had borderline intellectual functioning and a personality disorder resulting in the mild/moderate/marked difficulties assessed by Dr. Cottone in his March 4, 2005 Mental RFC Assessment.

The VE testified that such an individual could perform simple light jobs with limited co-worker and supervisor contact, such as light janitorial work, food preparer, and dining room helper. The VE further testified that if the individual were limited to sedentary work or if he were to have seizures at the work site even just once a month, there would be no jobs he could perform.

**ALJ's Decision of November 15, 2006 (Tr. 13-22)**

After summarizing Plaintiff's testimony at the hearing, the ALJ found that the medical evidence did not establish any impairment of combination of impairments that met or equaled a deemed-disabling impairment listed in the Commissioner's regulation. The ALJ summarized the medical record from October 2004 and onward and stated that he found no medical reason why Plaintiff, since November 1, 2004, did not have the RFC to perform light work (lifting no more than 20 pounds at a time with frequent lifting or carrying up to ten pounds) that did not require (1) more than occasionally climbing ropes, ladders, or scaffolds, or reaching overhead with the right shoulder; (2) working at unprotected heights, around dangerous moving machinery, or concentrated or excessive exposure to vibrations; (3) doing jobs requiring visual acuity better than 20/50 in the right eye and 20/40 in the left eye, and visual efficiency greater than 22.5% in the right eye and 25.8% in the left eye; or (4) doing jobs requiring more than simple repetitive tasks or

frequent interaction with coworkers, supervisors, and the general public. The ALJ stated that these restrictions were "more or less" the restrictions established by the state agency medical evaluators.

In support of this finding, the ALJ stated that no doctor who treated or examined Plaintiff since October 2004 stated or implied that he was disabled, or placed any long-term limitations on his abilities to do basic exertional activities, such as standing, sitting, and bending, beyond those noted in the above RFC. The ALJ stated that Plaintiff had had few documented instances or complaints of seizures since 2003 or 2004, "nothing approaching the 3-5 times a month he alleged at the recent hearing." The ALJ added that Plaintiff's Dilantin level was subtherapeutic in August 2004, and that to the extent Plaintiff's seizures were ever uncontrolled (something the evidence really did not show), it was due to non-compliance on his part.

The ALJ further stated that there was no evidence of any significant long-term limitations related to Plaintiff's right hand or shoulder, headaches, or left leg and ankle fractures. Plaintiff had had no surgery or hospitalizations nor been referred for physical therapy or to a pain clinic "in recent years," and there was no documented significant continuing adverse side effects from medications. The ALJ believed that Plaintiff's continued restricted daily activities were more by his choice than by "any apparent medical proscription," and that there was no longer any evidence of any chronic or ongoing mood disorder, adding that Plaintiff had never been referred to a mental health professional and that at the hearing, he displayed no obvious signs of depression or other

mental disturbance.

The ALJ found that Dr. Moore's limitation against social interaction was of "dubious medical validity" as it was imposed when Plaintiff was in an "untreated state." The ALJ also determined that Ms. Rogers' statements were "not proof of disability," as she was not trained medically and was predisposed to support Plaintiff, and that her statements, like Plaintiff's testimony, were inconsistent with the "preponderance" of the medical opinions in the case. The ALJ noted that under the Commissioner's Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpart P, Appendix 2, Rule 202.17, a person with Plaintiff's vocational profile who was able to perform light work was not disabled. Based upon the VE's testimony, the ALJ concluded that Plaintiff could be a janitor, food preparer, and dining room helper, and was thus not disabled.

## DISCUSSION

**Statutory Framework and Standard of Review**

Once an individual becomes entitled to disability and SSI benefits, his continued entitlement to benefits must be reviewed periodically. 42 U.S.C. § 423(f)(1); 20 C.F.R. § 416.949(a). If there has been medical improvement related to the claimant's ability to work, and the claimant is able to engage in substantial gainful activity, then a finding of not disabled will be appropriate. Id.; Nelson v. Sullivan, 946 F.2d 1314, 1315 (8th Cir. 1991). The "medical improvement" standard requires the Commissioner to compare a claimant's current condition with the condition existing at the time the claimant was found disabled and awarded benefits. Delph v. Astrue, 538 F.3d 940, 945-46 (8th Cir.

16

2008), cert. denied, 129 S. Ct. 1999 (2009)). The CDR process involves a sequential analysis prescribed in 20 C.F.R. § 404.1594(f), pursuant to which the Commissioner must determine the following:

> (1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment, (3) whether there has been a medical improvement, (4) if there has been a medical improvement, whether it is related to the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe, (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of his past relevant work activity, and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

Id.

The regulations define medical improvement as:

> [A]ny decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s).

20 C.F.R. § 416.994(b)(1)(I). Medical improvement can be found in cases involving the improvement of a single impairment if that improvement increases the claimant's overall ability to perform work related functions. Id. § 416.994(c)(2).

Judicial review of the Commissioner's decisions is limited to determining whether the Commissioner's findings are supported by substantial evidence. Substantial evidence

is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision. The reviewing court must consider evidence in the record that fairly detracts from, as well as supports, the ALJ's decision. Delph, 538 F.3d at 945.

Here, the key challenged findings by the ALJ are that Plaintiff's seizure disorder, mental problems, and exertional abilities medically improved since September 14, 2000, to the extent that Plaintiff could now perform certain simple jobs in the light work category.

**Plaintiff's Seizure Disorder**

Upon review of the record, the Court concludes that the ALJ's conclusion that Plaintiff's seizure disorder had medically improved since September 14, 2000, to the point where he would not have any seizures at a workplace is not supported by substantial evidence. Similarly, the Court does not believe that the record supports the ALJ's determination that if the disorder were uncontrolled, it was due to Plaintiff's medical non-compliance. Although there is evidence that Plaintiff did not always take his Dilantin as prescribed, there is no medical opinion in the record that this was the reason he continued to have seizures since the award of disability benefits. As noted above, on September 12, 2005, an examining physician wrote that it was not clear whether seizure episodes were related to poor medical compliance.

**Plaintiff's Mental Limitations**

On this record, it is clear that Plaintiff's level of intellectual functioning (IQ) did not medically improve since he was awarded benefits. Nor did his GAF improve -- it

remained at 55. The Court does not discern an adequate basis for discounting Dr. Moore's February 14, 2005 GAF diagnosis of 55 or his opinion, based upon the record and an interview/examination of Plaintiff, that Plaintiff would have difficulty in a competitive employment situation given his cognitive limitations.

**Physical RFC to Perform Light Work**

As noted above, in the decision to award Plaintiff disability benefits, the first ALJ found that Plaintiff could only perform sedentary work. Based upon the VE's testimony at the hearing, if Plaintiff were limited to sedentary work, there would be no jobs he could perform. It is not clear from the record what medical improvement allowed Plaintiff to now perform light work, as opined by non-examining state consultant Dr. Raabe, in his November 1, 2004 Physical RFC Assessment, upon which the second ALJ relied. Indeed, Plaintiff's subsequent injuries to his right hand and left ankle would suggest a decrease, not an increase in his exertional abilities.

The Court believes that a close case is presented here. In sum, however, the Court does not believe that there is substantial evidence on the record as a whole of a decrease in the medical severity of Plaintiff's impairments since September 14, 2000, such that he could now engage in substantial gainful activity. See Nelson, 946 F.2d at 1315 ("If the Government wishes to cut off benefits due to an improvement in the claimant's medical condition, it must demonstrate that the conditions which previously rendered the claimant disabled have ameliorated, and that the improvement in the physical condition is related to claimant's ability to work.")

The Court, therefore, believes that the decision of the ALJ should be reversed and that the case should be remanded for further development of the record. To support the termination of benefits, the Commissioner would have to obtain the opinion of a medical source that Plaintiff's seizure disorder was controlled, or controllable by medical compliance. In addition, the record should show a basis for a medical source's opinion that Plaintiff's exertional abilities improved from an ability to do only sedentary work to the ability to do light work. Of course, Plaintiff's continuing visual and mental limitations would have to be considered in the new CDR.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **REVERSED** and that the case be **REMANDED** for further development of the record.

The parties are advised that they have ten days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 26th day of August, 2009.